**David HOGG, Deceased,**

v.

**Pranee HOGG.**

**Appeal of William Hogg and Mary Hogg, Substituting for David Hogg, Deceased Appellants.**

Superior Court of Pennsylvania.

Submitted Oct. 7, 2002.
Filed Jan. 24, 2003.

Gunnar L. Armstrong, Lititz, for appellants.

Kenneth R. Jewell, Lancaster, for appellee.

Before: STEVENS, LALLY–GREEN and BECK, JJ.

OPINION BY BECK, J.:

█ ¶ 1 This case prompts us to consider the interplay of state domestic relations law and federal bankruptcy law in the context of postnuptial agreements. We hold that where a non-debtor spouse does not pursue her rights in the bankruptcy court, the state court distributing the marital estate may not reaffirm the debtor spouse's obligations set out in the couple's settlement agreement after those obligations have been discharged by the bankruptcy court.

¶ 2 Husband and Wife were married in 1972 and separated in 1995. After appearing before a Master, the couple entered into a property settlement agreement ("Agreement") in October of 1997.[1] In its opinion the trial court described the Agreement and the complex and lengthy events that followed its execution:

The [A]greement addressed division between the parties of the major portion of the tangible assets and other personal property of the marital estate, and allocated responsibility for unpaid income tax obligations incurred during the marriage, as well as certain commercial debts. The Agreement further provided that the marital residence and a few remaining items of personal property would be sold and that the proceeds, together with the value attributed to the previously divided marital personal property, be collectively distributed between the parties by Mr. Hogg receiving 47% of the net marital estate and Mrs. Hogg receiving the remainder [53%].

Specifically regarding the marital real estate, the postnuptial agreement provided that the property would be listed for sale, but if not under an agreement of sale by September 1, 1998, would be sold at public auction by a mutually selected auctioneer. However, as of the spring of 2001, the property had not been sold by either method and neither party, until their petitions to enforce the Agreement, filed respectively in May and June of 2001, had resorted to court involvement to obtain compliance with the Agreement. Each party blamed the other for the delay in selling the house by either method.

The complicating circumstance is that in February of 1998, Mr. Hogg filed for and on August 20, 1998 was granted, a Chapter 7 personal bankruptcy, discharging him, inter alia, from those marital obligations, including pre-separation tax liens and undisclosed, post-separation credit card debt on a joint account, as well as the contractual obligation to Pranee Hogg [Wife] created by his postnuptial Agreement just months prior to the bankruptcy filing.

After hearings the court issued orders of September 28 and October 19, 2001, establishing procedures to accomplish the sale of the former marital residence by public sale in accordance with the postnuptial agreement and addressing peripheral claims by Mr. Hogg of alleged waste committed by and rental credit owed by Pranee Hogg as well as the question of interpretation of the Agreement's language. Pursuant to the directive of those orders, the property was sold at public auction on December 8, 2001 and settlement, delayed due to Mr. Hogg's untimely death (on January 3, 2002), was held on February 1, 2002.

---

1. The court issued a divorce decree in February of 1998.

At settlement, the settlement agent properly collected from the selling parties' proceeds of sale, any unpaid debts which had the effect of encumbrance on the title to the real estate, as well as unpaid tax liens from income tax obligations incurred prior to separation, including portions of such joint encumbrances for which Mr. Hogg had first agreed to be responsible under the post-nuptial agreement and then had discharged in bankruptcy as to himself, with the resulting legal effect that the entire amounts remain due to the lienholders by Pranee Hogg as a joint obligor as only Mr. Hogg's responsibility for, rather than the amount of any such obligation, was what the bankruptcy discharged.

Trial Court Opinion, dated 6/4/02, at 1–3.[2]

¶ 3 We begin by noting that the certified record before us includes few bankruptcy documents other than the order providing that Husband has been granted a discharge. We observe however that both parties and the trial court agree that Husband's debts set out in the Agreement were discharged by the Bankruptcy Court and there is no claim that anything other than the Agreement itself forms the basis for Husband's obligation to pay those debts.

¶ 4 At issue here is the proper distribution of $30,771.76, the net cash proceeds from the sale of the marital residence (the proceeds). The record establishes that most assets of the estate have been distributed pursuant to the Agreement, but that this amount, which became accessible only after the sale of the property, remains in escrow pending distribution.

¶ 5 Husband brought an action to enforce the Agreement and sought to receive his share of the proceeds pursuant to the Agreement, that is, an amount that would reflect his acquisition of 47% of the marital estate.[3] Husband asserts this amount to be $19,558.84. He reaches this sum by calculating the marital estate's value in the following manner. He adds the amount of the estate Wife already received, less the debts she assumed pursuant to the Agreement, to the amount he already received. He does not subtract from that number the debts he assumed in the Agreement but which the Bankruptcy Court discharged.

¶ 6 The trial court, on the other hand, did consider those debts, although discharged in bankruptcy, that Husband was obligated to pay pursuant to the Agreement. The court granted Wife a credit for those debts (since she remained obligated to pay them and did so in order to facilitate the sale of the marital residence) and deducted the debts from Husband's share (since he had promised to pay them, but failed to do so). As a result, the trial court found that Husband was entitled only to $7,057.35.

¶ 7 The trial court held Husband responsible for his Agreement debts, notwithstanding the bankruptcy court's discharge of those debts, under the authority of 23 Pa.C.S.A. § 3323(f), the equity power of the court.[4] Without citation to cases in

---

2. As noted by the trial court, Husband died in January, 2002. This appeal is brought by Husband's children, who were appointed executors of his estate. Despite this change in parties, we refer to the appellant as Husband throughout this opinion for purposes of clarity.

3. As noted by the trial court in its recitation of the facts, Wife initially filed a petition to enforce the Agreement in order to accomplish the sale of the marital property. Husband's petition to enforce followed.

4. That section provides:

support of such an application of § 3323, the trial court relied primarily on the fact that Husband himself sought to enforce the Agreement, thereby somehow reaffirming it. The court reasoned:

> It is of pivotal significance that the actions bringing this matter before the court are not limited to [Wife] Pranee Hogg's petition to enforce against Mr. Hogg an obligation which had been discharged in bankruptcy, but also David Hogg's own petition to collect entitlements established for him under the parties' postnuptial agreement. His petition requesting Ms. Hogg to comply with the Agreement included not merely completion of the sale of the marital residence, but also specific performance of virtually all other obligations of Ms. Hogg under the Agreement which benefited him. Essentially, Mr. Hogg's position is that while all of his obligations under the Agreement have been discharged in bankruptcy, all of Ms. Hogg's obligations to him, even though accepted by her in consideration for those discharged reciprocal obligations, must be performed for his benefit.... Mr. Hogg's own petition to enforce the postnuptial agreement had the effect of reaffirming the entirety of the very agreement which he, in defense against Ms. Hogg's petition, sought to avoid having enforced against himself. He may not equitably request to enforce a contract, but simultaneously deny that it remains a viable agreement.

Id. at 6–7.

█ ¶ 8 On appeal, husband complains that the trial court had no authority to "reaffirm" Husband's debts set out in the Agreement. He argues that because the debts were discharged in bankruptcy and because he did not waive bankruptcy protection, two facts explicitly acknowledged by the trial court, the federal court discharge is controlling on the state court. After a careful review of the applicable law, we conclude that Husband is correct.[5]

¶ 9 The relationship between federal bankruptcy laws that seek to protect a debtor by granting him a "fresh start" and state domestic relations laws that seek to effectuate economic justice in the division of marital property has been the subject of much criticism. *See e.g.*, Rebecca M. Burns, *Killing Them With Kindness: How Congress Imperils Women and Children in Bankruptcy Under the Façade of Protection*, 76 Am Bankr. L.J. 203 (Spring 2002); Alyson F. Finkelstein, *A Tug of War: State Divorce Courts Versus Federal Bankruptcy Courts Regarding Debts Resulting From Divorce*, 18 Bankr. Dev. J. 169 (2001); Jeffrey Margolin, *Taming the Pernicious Creature That Is § 523(A)(15) of the United States Bankruptcy Code*, 8 Cardozo Women's L.J. 45 (2001).

¶ 10 Traditionally, the Bankruptcy Code has protected non-debtor spouses and children by precluding discharge of a debtor

---

In all matrimonial causes, the court shall have full equity power and jurisdiction and may issue injunctions or other orders which are necessary to protect the interests of the parties or to effectuate the purposes of this part and may grant such other relief or remedy as equity and justice require against either party or against a third person over whom the court has jurisdiction and who is involved in or concerned with the disposition of the cause.

23 Pa.C.S.A. § 3323(f).

**5.** Wife argues in the alternative that she would be entitled to the trial court's award under principles of setoff and/or recoupment. We disagree. Our supreme court's opinion in *Cohen v. Goldberg*, 554 Pa. 201, 720 A.2d 1028 (1998), convinces us that neither principle is applicable here.

spouse's alimony and support obligations. 11 U.S.C. § 523(a)(5); *Buccino v. Buccino,* 397 Pa.Super. 241, 580 A.2d 13 (1990). However, obligations of a debtor spouse that emanated from provisions of property settlement agreements not directed at support or alimony were discharged as a matter of course. Margolin, *supra,* at 47. But in 1994, the Bankruptcy Code was amended and a new subsection was added to address those marital obligations that were not for alimony or support, *i.e.,* debts incurred as a result of a property settlement agreement. The new provision deemed such debts *non-dischargeable* unless 1) the debtor could not afford to pay them or 2) discharging the debt would result in a benefit to the debtor that outweighed the detrimental consequences to the non-debtor spouse. 11 U.S.C. § 523(a)(15).

■■■ ¶ 11 Although § 523(a)(15) is viewed as weak protection for the non-debtor spouse, its intended purpose was to "prevent a debtor spouse from obtaining a discharge of debts arising from certain property settlement agreements." Bernice B. Donald & Jennie D. Latta, *The Dischargeability of Property Settlement and Hold Harmless Agreements in Bankruptcy: An Overview of § 523(A)(15),* 31 Fam. L.Q. 409, 410, 431 (Fall 1997). However, there are explicit procedural rules that govern § 523(a)(15), as well as jurisdictional restraints that apply to the provision. For instance, while § 523(a)(15) offers protection to the non-debtor spouse with a settlement agreement, the Code nonetheless places the burden on the non-debtor spouse to seek the provision's protection and to do so in a specific manner. Thus, the non-debtor spouse who wishes to retain the benefit of a settlement agreement is required to raise the issue in an adversary proceeding in the Bankruptcy Court within sixty days of the first date

set for the meeting of creditors. *Id.* at 411; Fed. R. Bankr.P. 4007(c). Unlike in the context of alimony and support, "[t]he onus is on the nondebtor party to promptly raise and prevail on the issue of nondischargeability when it comes to property settlement agreement debts." Burns, *supra,* at 213. Further, only the Bankruptcy Court judge has jurisdiction to decide whether and to what extent a settlement agreement debt may be deemed nondischargeable. George H. Singer, *Section 523 Of The Bankruptcy Code: The Fundamentals Of Nondischargeability In Consumer Bankruptcy,* 71 Am. Bankr. L.J. 325, 327–28 (Summer 1997). This too is unlike alimony and support debts, jurisdiction over which is shared by the federal bankruptcy court and the state divorce court. *Id; Buccino, supra.*

¶ 12 It is clear that as a result of material, substantive changes in the Bankruptcy Code, a domestic relations lawyer representing a non-debtor spouse must intervene in the debtor spouse's bankruptcy proceedings in order to represent his or her client zealously. While the prospect of entering the federal bankruptcy court maze is daunting, the new provisions set out above make the task mandatory.

■■■ ¶ 13 This detailed and complex federal framework for seeking to hold a debtor spouse to the obligations he assumed in a property settlement agreement, and the clear statutory mandate that such a request may be litigated only in federal bankruptcy court, lead us to conclude that the trial court was without authority to "reaffirm" Husband's debts based on state equitable principles. Once the debts had been discharged, here apparently without opposition in the bankruptcy proceedings, the state court was powerless to change that fact. We are cognizant of the fact that the divorce court's equity powers under § 3323(f) have extended to matters

*involving* federal issues. *See Piso v. Piso,* 761 A.2d 1215 (Pa.Super.2000) (divorce court's equitable powers include authority to award dependency exemptions from federal income tax to non-custodial parent). However, the equitable powers of the state court simply cannot trump a vast federal statutory scheme like the one set out in the Bankruptcy Code. The Supremacy Clause of the United States Constitution requires that the federal scheme prevail over a state law application. *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Werner v. Plater-Zyberk,* 799 A.2d 776 (Pa.Super.2002).

¶ 14 Thus, the trial court erred in concluding that it was authorized to "reaffirm" Husband's debts that were discharged in bankruptcy and we must vacate the trial court's order and remand the matter so that distribution may be recalculated.[6]

¶ 15 The question remains however as to precisely how the trial court must accomplish the distribution. Wife sought, and the trial court approved, a division that included calculation of the debts Husband assumed. Our analysis above precludes this. Husband sought, but was denied, a division that granted to him all of the benefits of the Agreement without the concomitant obligations he assumed therein. Our analysis above establishes that those obligations may not be considered. We are left then to determine exactly what benefit Husband is entitled to under the Agreement.

¶ 16 Husband argues that he is entitled to 47% of the proceeds from the sale of the marital home (along with some specific items of value the Agreement granted to him but which he did not receive). But the Agreement upon which Husband relies did not grant him 47% of the proceeds from the house; it granted him 47% of the marital estate. We are convinced that this is what the Agreement envisioned and rely on the statement of Husband's counsel who made this fact quite clear. Counsel, after setting forth in detail the myriad rights and obligations of the parties in the Agreement, articulated the essence of the Agreement when he stated: "[I]t's the contemplation of the parties that the equitable division of marital property will be 47 percent for Mr. Hogg, 53 percent for Mrs. Hogg." Agreement Transcript, dated 10/29/97, at 17.

¶ 17 Thus, while the specific terms of the Agreement required Wife to pay certain joint obligations of the parties and Husband to pay others, a scenario no longer possible after Husband's discharge in bankruptcy, the ultimate goal was to divide the marital property in the ratios set out above. Husband's discharge in bankruptcy may have wiped away his specific obligations as set forth in the Agreement, but the discharge did not change the ratio of the marital estate to which he was entitled.

¶ 18 We conclude that while the federal bankruptcy discharge precludes the state court from insisting that Husband pay the precise debts he promised to pay, the discharge does not operate to increase Husband's pro rata share of the marital estate. Indeed, Husband concedes as much as the

---

6. Again, our record of what occurred in the bankruptcy proceedings is slim. However, Wife makes no claim that she acted or attempted to act in accordance with § 523(a)(15). Instead, she concedes that Husband's debts indeed were discharged. Whether and to what extent Wife would have prevailed in a § 523(a)(15) adversary pro-

ceeding is uncertain. A debtor spouse's promise to pay third parties is not covered by the provision. "It is only the obligation owed to the spouse or former spouse—an obligation to hold the spouse or former spouse harmless—which is within the scope of this section." Donald & Latta, *supra,* at 417.

gravamen of his claim is that he is entitled to his 47% share set out in the Agreement.

¶ 19 As a result, we must remand this matter to the trial court so that it may calculate the value of the marital estate and determine what portion of the funds that remain should be awarded to Husband pursuant to the Agreement upon which he relies.[7]

¶ 20 That calculation may result in Wife getting less than that granted by the trial judge who erroneously "reaffirmed" Husband's Agreement debts. In addition, the calculation may cause Husband to receive less than he claims to be entitled to after the discharge, though more than what the trial court initially granted to him. The significant fact and overriding principle is that this calculation recognizes both 1) that

Husband's *specific* obligations in the Agreement are no longer enforceable due to the bankruptcy discharge and 2) that the only true benefit to which Husband ever was entitled, both before and after his discharge in bankruptcy, is 47% of the value of the marital estate. Our resolution grants him just that and no more.

¶ 21 Order vacated; matter remanded so that the court may calculate the proper distribution of the remaining marital property. Jurisdiction relinquished.

---

7. For instance, if the net marital estate has a value of $100,000.00, the simple calculation calls for Wife to receive $53,000.00 and Husband to receive $47,000.00. However, any joint liabilities of the estate that have been satisfied by one of the spouses must be credited to that spouse. Otherwise the true value of the marital estate, that which is subject to distribution pursuant to a precise ratio set out in the Agreement, is skewed. In this case, some assets have been distributed and some joint debts have been paid. As a result, the court cannot simply divide the remaining marital funds according to the 53/47 split. Rather, the court must consider the distributions made to each party and the payments made by each party in order to accomplish the 53/47 split of the estate set out in the Agreement.